UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| MARLON CARPENTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:24-CV-227-CHB-CJS |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| JEFFERY CARMACK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This action is before the Court on the Motion for Summary Judgment, [R. 44], filed by Defendants Jeffery Carmack, Deanna K. Noble,[1] Daniel Akers, and Troy Wilson. Plaintiff Marlon Carpenter, *pro se*, has not responded, *see* [R. 60], so the Court views Defendants' Motion as unopposed.[2] This matter is now ripe for review. For the reasons set forth below, Defendants' Motion for Summary Judgment, [R. 44], will be granted in part as to Carpenter's federal claims, and Carpenter's state law claims will be dismissed without prejudice pursuant to 18 U.S.C. § 1367(c)(3).

## I. BACKGROUND

This action stems from Carpenter's time incarcerated at the Lee Adjustment Center ("LAC"), which is located in Beattyville, Lee County, Kentucky, within the Central Division of

---

[1] On July 15, 2026, Defendants, through counsel, filed Notice that Noble died on April 22, 2026. *See* [R. 62]. Federal Rule of Civil Procedure 25 requires the dismissal of a party decedent, if, after 90 days following service of a statement noticing the death, a motion to substitute has not been filed on behalf of the decedent. Because, as of the entry of this Memorandum Opinion and Order, 90 days have not passed since Defendants filed their Notice, [R. 62], Noble is still a party in this action.

[2] "Even when faced with an unopposed motion for summary judgment, the district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met its burden." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013).

this Court at Lexington. *See* LR 3.1(2)(B). Carpenter arrived at LAC in January 2023, [R. 44-3, p. 3], and around a year later, Carpenter faced several disciplinary actions, which, in large part, serve as the basis for his claims in this Court, *see generally* [R. 1].

It is worth noting up front that disciplinary actions at LAC are governed by a Kentucky Department of Corrections ("KDOC") policy. Specifically, Policy Number CPP 15.6, titled Adjustment Procedures and Programs, sets forth an internal protocol authorizing LAC staff to bring charges against an inmate for violating KDOC rules.[3] *See* [R. 44-3, p. 114]. Notably, KDOC has a separate policy for grievances that is also controlling at LAC. *See* [R. 47-1, pp. 16–18 (Carpenter discussing the difference between the two procedures)]; *see also* [R. 44-3, p. 80]. Under that policy, Policy Number CPP 14.6, titled Inmate Grievance Procedure, an inmate can file a grievance in an attempt to resolve certain issues.[4] *See* [R. 44-3, p. 80].

On January 8, 2024, Carpenter was seen on video by Threat Group Officer Carmack participating in a handshake with another inmate. *Id.* at 6. Carmack, who is tasked with (and trained in) resolving gang-related matters at LAC, believed the handshake was associated with a gang and

[3] The disciplinary process begins when an employee files a report against an inmate, which is then investigated by a separate staff member. [R. 44-3, pp. 117–21]. After the investigation concludes, the policy calls for a hearing before another uninvolved LAC employee. *Id.* at 121–24. At the hearing, the inmate can present documentary evidence and call witnesses. *Id.* A written decision is then completed, which includes factual findings, any discipline imposed, and reasons for imposing said discipline. *Id.* That decision can be appealed to the Warden, which is the highest level of appeal under this procedure. *Id.* at 124–25.

[4] Inmates are required to file grievances within five business days after a grievable incident occurs. *See* [R. 44-3, p. 80]. The policy defines a grievable issue as "any aspect of an inmate's life in prison that is not specifically identified as a non-grievable issue." *Id.* at 74. Non-grievable issues include thirteen enumerated items, including disciplinary actions and conduct subject thereto. *Id.* at 74–75. Once a grievance has been properly filed, an attempt must be made to resolve the grievance informally. *Id.* at 82. If the grievant is not satisfied through informal resolution efforts, the grievant may then make a written request for a hearing. *Id.* at 83. After such hearing concludes, a grievance committee enters a recommendation to the Warden. *Id.* at 85. The grievant can appeal the recommendation within three business days to the Warden. *Id.* The Warden must issue a written decision, which can be appealed within three business days to the Commissioner. *Id.* at 86–87.

charged Carpenter for possession of or displaying STG paraphernalia.[5] *Id.*; *see also* [R. 44- 2, pp. 2, 4]. Carpenter pleaded not guilty to the charge and requested a hearing.[6] [R. 44-3, p. 6].

On January 22, 2024, Carpenter's hearing took place before Seargent Noble in her capacity as Hearing Officer. *Id.* at 6, 8. Noble found Carpenter guilty and stripped him of sixty days of good-time credit. *Id.* That same day, Carpenter appealed the penalty to Warden Akers, claiming the handshake was religious and was not related to gang activity. *Id.* at 10. Akers upheld the disciplinary decision, noting the "due process requirements" had been met and there was sufficient evidence to support a finding of guilt. *Id.* at 9.

On January 30, 2024, Carpenter was involved in another incident that led to additional disciplinary actions against him. The incident began with a verbal altercation in one of the prison yards between Carpenter and Unit Manager Wilson. *See* [R. 46]; *see also* [R. 44-3, pp. 15, 43]. There was a dispute between the pair about Carpenter's bed assignment. Namely, Carpenter wanted to move into the west dorm, but Wilson informed Carpenter he could only be moved into the north dorm because he was on a bottom-bunk restriction and the west dorm did not have any bottom-bunk vacancies. *See* [R. 44-3, pp. 15, 43]. Carpenter became upset and told Wilson that "he was going to break [his] fucking face." *Id.* After this remark, Wilson and Correctional Officer Randy Wagers instructed Carpenter to place his hands behind his back. *Id.* Carpenter ignored the command and walked toward Wilson. *Id.* Wagers stepped forward to intervene with pepper spray.

---

[5] STG, or security threat group, is defined as "a formal or informal ongoing group of offenders" that, "engage[s] in or ha[s] a pattern of continued criminal activity or departmental rule violations." [R. 44-3, pp. 101–02].

[6] On January 9, 2024, Carpenter was also charged by Case Manager James White for a failed bed inspection. *See* [R. 44-3, p. 11]. Carpenter was ultimately found guilty of the charge and required to complete twenty additional duty hours by Noble. *See id.* at 13. Carpenter did not appeal this decision.

*Id.* at 19, 29, 43. Just after Wagers began spraying, Carpenter knocked the canister out of Wagers's hand. *Id.*

Several more LAC employees arrived in the yard to contain the situation after Wilson called a "Code 1," which is a request for other officers to report to the area to provide assistance. *See* [R. 46; R. 44-4, p. 2]; *see also* [R. 44-3, p. 43]. Quickly after arriving on the scene, Sergeant Justin McCoy sprayed Carpenter with more pepper spray. *See* [R. 46]; *see also* [R. 44-3, p. 43]. Although Carpenter initially retreated after being sprayed, he quickly turned back toward Wilson and began walking toward him again. *See* [R. 46]; *see also* [R. 44-3, p. 43]. Captain Joseph Burkhart then unholstered his taser and deployed it on Carpenter because Carpenter disobeyed commands to get on the ground. *See* [R. 46]; *see also* [R. 44-3, p. 43]. Carpenter immediately fell to the ground after being tased. *See* [R. 46]. Carpenter was placed in handcuffs and moved to a different area of the prison to receive medical attention. *See id.*; *see also* [R. 44-3, p. 43]. While being escorted, Carpenter knocked Sergeant Jeffery Warner into a wall. [R. 44-3, p. 19].

Based on the January 30, 2024, incident, Carpenter was charged under the disciplinary policy with three separate violations: one listed as violent demonstration for threatening Wilson, *id.* at 15, another listed as physical action against an employee for shoving Warner, *id.* at 19, and a third listed as physical action against an employee for knocking the pepper spray out of Wagers's hand, *id.* at 29. Carpenter pleaded not guilty and requested a hearing for all three charges. *See id.* at 15, 19, 29. Noble held a combined hearing on February 12, 2024, wherein Carpenter was found guilty of the charges. *Id.* at 17, 27, 33. Carpenter's penalty included, among other disciplinary actions, forfeiture of ninety days of good-time credit for his violent demonstration charge and

forfeiture of a combined 1,460 days of non-restorable good-time credit for the physical action charges.[7] *See id.*

Carpenter appealed to Warden Akers on February 16, 2024. *See id.* at 35. The Appeal Form is marked "LAC-2024-0000493," *id.*, which is the number assigned to his disciplinary action involving the pepper spray, *see id.* at 29. In his Appeal Form, Carpenter describes the charges as "physical actions against an employee" and "violent demonstration," and his arguments are directed at his charges for shoving Warner and threatening Wilson. *See id.* at 35. Warden Akers upheld all the disciplinary decisions. *Id.* at 18, 28, 34. Specifically, Akers noted that the "due process requirements" had been met, that there was sufficient evidence to support a finding of guilt regarding the violent demonstration charge, *id.* at 18, and that Carpenter had untimely appealed the other two charges, *id.* at 28, 34.

On August 21, 2024, Carpenter initiated this action by filing his Complaint in this Court against the above-named Defendants and Commissioner Cookie Crews.[8] *See* [R. 1]. Factually, the Complaint predominantly details the disciplinary actions listed above, but Carpenter also alleges that Carmack strip-searched and verbally harassed him based on his religious beliefs. *See id.* at 2.

As a preliminary matter, it is difficult to discern what claims Carpenter seeks to bring in this action. In the Complaint, Carpenter describes his legal claims as follows:

> Ky Const 1 states rights of life, liberty worship. Ky Const 5 Right of religious freedom. Ky Const 227 indictment or prosecution for misfeasance or malfeasance.

---

[7] Although Defendants argue Carpenter only lost ninety days of good-time credit as a result of these disciplinary proceedings, *see* [R. 44-1, p. 15], the record does not support their position. The Disciplinary Reports reflect that Carpenter lost 730 days of non-restorable good-time days for both physical action charges. [R. 44-3, p. 27, 33].

[8] Before initiating the instant case, Carpenter filed another action stemming from the same conduct that was ultimately dismissed without prejudice. *See Carpenter v. Wilson*, No. 5:24-cv-124-DCR (E.D. Ky. May 14, 2024).

> Const 17 cruel and unusual punishment, eight amendment physical and physiological harm is prohibited.

*Id.* at 6 (verbatim). This description does little to illuminate what claims Carpenter seeks to bring based on the strip searches, verbal harassment, the disciplinary actions, and the January 30, 2024, incident. However, Defendants characterize Carpenter's causes of action as follows: (1) a 42 U.S.C. § 1983 claim against Carmack for violating his First Amendment rights; (2) § 1983 claims against Noble and Akers for violating his Fourteenth Amendment right to procedural due process and; and (3) state law claims for violations of Sections 1, 5, 17, and 227 of the Kentucky Constitution. *See generally* [R. 44-1]. Although Defendants do not attempt to characterize Carpenter's claim against Wilson, *id.*, the record generally reflects that Carpenter seeks to bring a § 1983 claim against Wilson for violating Carpenter's Eighth Amendment right against the use of excessive force. Carpenter does not object to this characterization.[9] Consequently, the Court will construe Carpenter's claims in the manner framed by Defendants. Based on his claims, Carpenter seeks to recover $5,000,000 in addition to the restoration of his lost good-time credits and a written apology. [R. 1, p. 10].

Upon preliminary review, the Court dismissed Carpenter's claims against Commissioner Crews for failure to state a claim. *See* [R. 6]. After the remaining Defendants filed their respective Answers, [R. 18]; [R. 22], a simplified Scheduling Order was entered, *see* [R. 27]. Ultimately, the parties had until December 8, 2025, to complete all pretrial discovery and until January 8, 2026, to file dispositive motions. *See* [R. 41].

---

[9] In fact, Carpenter's responses to Defendants' discovery requests corroborate Defendants' construction of his claims. Indeed, Carpenter's deposition testimony, *see* [R. 47-1, pp. 22–24, 62, 84–85], and responses to Defendants' written discovery requests, *id.* at 201–05, align with Defendants' characterization of his claims.

On January 9, 2026, Defendants filed their Motion for Summary Judgment.[10] *See* [R. 44]. Through their motion, Defendants argue they are entitled to summary judgment on all claims either on the merits or because Carpenter failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). *See* [R. 44-1]. Following multiple *sua sponte* extensions granted by the Court, *see* [R. 53; R. 54; R. 60], Carpenter had until August 7, 2026, to file his response to Defendants' dispositive motion.[11] In the order granting that final extension, the Court warned Carpenter that the failure to file a response may be grounds for granting the motion; if he failed to respond to the motion, the Court would view the motion as unopposed; and this was his "final opportunity to file a response" to the Motion for Summary Judgment. [R. 60, pp. 3–4]. As of the entry of this Memorandum Opinion and Order, Carpenter has not filed a response. Therefore, the Court views Defendants' Motion for Summary Judgment as unopposed. *See generally* [R. 60]. This matter is now ripe for review.

## II. LEGAL STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. That Rule provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

[10] Defendants later moved for leave to file their dispositive motion late. *See* [R. 63]. The Court granted that motion, so the Motion for Summary Judgment is considered timely filed. *See* [R. 64].

[11] Carpenter's original deadline to file a response was set for February 26, 2026. *See* [R. 53]. After Carpenter failed to file a response or make any other filing within that timeframe, the undersigned extended his deadline to respond to March 23, 2026. *See* [R. 54]. On March 31, 2026, Carpenter filed a letter requesting leave to obtain unspecified discovery. *See* [R. 55]. The Court construed the filing as a motion under Federal Rule of Civil Procedure 56(d), *see* [R. 56], which Rule permits courts to take certain actions if a nonmovant lacks the information necessary to oppose a motion for summary judgment. After the motion was fully briefed, *see* [R. 57; R. 59]; *see also* [R. 61], the Court denied the motion because Carpenter failed to "articulate why the additional discovery is necessary to respond to Defendants' dispositive motion." [R. 60, p. 3]. Additionally, the Court granted Carpenter "a final opportunity" to file his response and set the deadline to August 4, 2026. *Id.* at 3–4. However, by operation of the Federal Rules, Carpenter's deadline was extended by three additional days to August 7, 2026. *See generally* Fed. R. Civ. P. 6.

Fed. R. Civ. P. 56(a). Under Rule 56, once the movant has met its burden, the burden shifts to the nonmovant to present "specific facts showing that there is a genuine issue for trial." *Arendale v. City of Memphis*, 519 F.3d 587, 593–94 (6th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When ruling on a motion for summary judgment, the district court accepts the nonmovant's evidence as true and draws all reasonable inferences in favor of the nonmovant. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, to survive summary judgment, the nonmovant cannot rely on "conjecture or conclusory accusations" but must instead be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Arendale*, 519 F.3d at 605 (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Conclusory assertions supported only by, for example, a plaintiff's own opinions cannot withstand a motion for summary judgment. *Id.*

## III. ANALYSIS

As discussed in greater detail above, the Court construes Carpenter's Complaint as raising the following claims: (1) a § 1983 claim against Carmack for violating his First Amendment rights; (2) § 1983 claims against Noble and Akers for violating his Fourteenth Amendment right to procedural due process; (3) a § 1983 claim against Wilson for violating his Eighth Amendment right against the use of excessive force; and (4) state law claims for violations of Sections 1, 5, 17, and 227 of the Kentucky Constitution. Defendants seek summary judgment on all of Carpenter's claims. [R. 44].

**A. Prison Litigation Reform Act ("PLRA")**

Although in their briefing Defendants argue that Carpenter's federal claims are barred by the PLRA after it addresses the merits of his claims, *id.*, the Court will address the PLRA arguments first. The PLRA requires an individual confined in any jail, prison, or other correctional facility to fully exhaust available administrative procedures before filing an action relating to his conditions of confinement. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). This requirement of the PLRA is an affirmative defense that must be pleaded and proven by the defendants in an action. *See Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007)). "A prisoner exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution." *Id.* "[T]he PLRA's exhaustion requirement is designed to give prison officials a fair opportunity to address a prisoner's claims on the merits before federal litigation is commenced." *Id.* at 592.

In this case, Defendants have raised the PLRA as an affirmative defense, *see* [R. 18, p. 3]; [R. 22, p. 3], and, in their Motion for Summary Judgment, they argue that Carpenter did not comply with the PLRA because he failed to file a grievance regarding the conduct that serves as the basis for his claims and/or that he failed to appeal certain disciplinary proceedings, *see* [R. 44-1, pp. 22–23].

Under KDOC's grievance policy, which is applicable at LAC, inmates can file grievances regarding "any aspect of an inmate's life in prison that is not identified as a non-grievable issue." [R. 44-3, p. 74]. Non-grievable issues, according to the policy, include, among other items:

> Disciplinary procedures, Adjustment Committee decision, Unit Hearing Officer decision, Adjustment Officer decision, or Warden's review of these decisions, incident where the grievant received a disciplinary report, or incident where the grievant received a disciplinary report and the report has been dismissed if an inmate receives a disciplinary report over the issue after filing the grievance, the grievance shall be rendered moot and the inmate shall use the adjustment process for this matter.

*Id.*

Notably, almost all the conduct that serves as the basis for Carpenter's claims was subject to the disciplinary process at LAC. For instance, Carpenter's claims against Carmack are primarily rooted in the disciplinary action against him based on the handshake Carmack characterized as a gang handshake. *See, e.g.*, [R. 47-1, p. 202]. The same is true of his claims against Akers and Noble for allegedly violating his rights based on the actions they each took in connection with the disciplinary proceedings initiated against him. *See id.* at 203–04. Therefore, these claims were "non-grievable issues" under KDOC's grievance policy.[12]

Relevant here, the Sixth Circuit has observed that "a prisoner 'cannot be required to exhaust administrative remedies regarding non-grievable issues.'" *Ryan v. G. Robert Cotton Corr. Facility*, No. 22-1808, 2023 WL 6059802, at *3 (6th Cir. May 15, 2023) (quoting *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004)); *see also Mays v. Kentucky Dep't of Corrs.*, No. 3:17-cv-P290-JHM, 2018 WL 4603153, at *3 (W.D. Ky. Sep. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues.") (collecting cases)). Because KDOC, by policy, does not allow inmates to grieve disciplinary

[12] Defendants argue that Carpenter could likely have grieved his claim brought against Wilson. [R. 44-1, p. 23]. However, Defendants do not characterize the claim, *id.*, and as noted above, it is hard to determine exactly what claim Carpenter brings. In any event, as is discussed below, one of two outcomes is certain. On one hand, if Carpenter's claim against Wilson could have been grieved, it would be barred by the PLRA. On the other hand, if the claim could not have been grieved and was, thus, not barred by the PLRA, it fails on its merits. *See infra* § III, B, 3.

actions or conduct subject thereto, Carpenter was not required to file a grievance with respect to the majority of the claims he brings in this action. *See Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006) (holding that because "TDOC has a flat rule declining jurisdiction, in its grievance process for grievances that are related to institutional placement and custody level" an inmate was not required to file a grievance) (internal quotation marks omitted).

Further, to the extent Defendants argue the PLRA bars Carpenter's claims because he failed to appeal disciplinary proceedings, [R. 44-1, p. 23], those disciplinary proceedings are unrelated to the instant action.[13] And Carpenter appealed three of the five decisions in his disciplinary proceedings at LAC to Warden Akers. *See* [R. 44-3, pp. 10, 35]. Namely, Carpenter appealed the disciplinary actions related to the handshake, threatening Wilson, and shoving Warner. *See id.* Appealing to the Warden is the last step in the disciplinary procedure, *see id.* at 125 (providing inmates may not appeal disciplinary decisions beyond the Warden), and that is the procedure LAC directed him to use to pursue those claims, *id.* at 74. Therefore, even if Carpenter were required to exhaust his administrative remedies, it appears he did so with respect to the issues presented in those disciplinary actions. *See Ellison v. Beavers*, No. 5:18-cv-74-TBR, 2020 WL 1452385, at *3 (W.D. Ky. Mar. 25, 2020) (finding that if an inmate exhausted his administrative remedies under either KDOC's grievance procedure or disciplinary action procedure, the PLRA was satisfied).

Still, Carpenter alleges that Carmack violated his First Amendment rights by strip-searching him and verbally harassing him. This conduct was not subject to disciplinary action and, thus, could have been grieved by Carpenter. *See generally* [R. 44-3]. Carpenter did not file a grievance related to this conduct, and his own deposition testimony demonstrates that he

[13] Defendants highlight that Carpenter failed to appeal the disciplinary proceedings involving his failed bed inspection and the physical action taken against Warner. [R. 44-1, p. 23]. As discussed at length above, Carpenter does not raise any claims in this action related to those incidents.

understands how the grievance procedure at LAC works. *See* [R. 47-1, pp. 15–16, 97]. Moreover, Carpenter has not offered any evidence to suggest that the grievance procedure is a dead end, is incapable of use, or that LAC staff stood in his way of filing a grievance. *See Ross v. Blake*, 578 U.S. 632, 642–44 (2016). Consequently, any First Amendment claim Carpenter asserts against Carmack based on a strip-search or verbal harassment should be dismissed for failure to exhaust administrative remedies under the PLRA. *See, e.g.*, *Napier v. Laurel Cnty.*, No. 6:06-cv-368-ART, 2009 WL 2255767, at *6 (E.D. Ky. July 29, 2009) (dismissing a prisoner's claims under PLRA where "he understood the grievance process, but simply decided not to utilize it").

In sum, only Carpenter's claims arising out of conduct unrelated to LAC's disciplinary procedure should be dismissed under the PLRA. Consequently, the Court will proceed to the merits of his other federal claims.

**B. Carpenter's Federal Claims**

Carpenter asserts claims against Defendants under 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights. Relevant here, § 1983 creates a private right of action against state actors for violations of the United States Constitution. "To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). The second element is not in dispute here, so the only issue is whether Defendants violated Carpenter's constitutional rights. For the reasons stated below, Carpenter cannot establish that Defendants violated his constitutional rights.[14] Accordingly, the

[14] Although Defendants assert qualified immunity as an affirmative defense, *see* [R. 18; R. 22], they do not argue an entitlement to it in their Motion for Summary Judgment, *see* [R. 44-1]. As such, qualified immunity will not be addressed in this Memorandum Opinion and Order. Even so, as Defendants did not violate the Constitution, qualified immunity would apply. *See Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014)

Motion for Summary Judgment will be granted to the extent Defendants seek judgment as a matter of law on Carpenter's federal claims.

**1. First Amendment Claim**

Carpenter first claims that Carmack violated his First Amendment rights. On this point, Carpenter alleges Carmack violated his right to religious freedom in three ways: by strip-searching him, by initiating a disciplinary action against him for a religious handshake, and by verbally harassing him. Although the claims based on the strip-search and verbal harassment are barred by the PLRA, *see supra* § III, A, the merits of Carpenter's claim based on that conduct will also be addressed for completeness of the record.

The First Amendment provides, in part, that "Congress shall make no law . . . prohibiting the free exercise [of religion.]" U.S. Const. amend. I. Although prisoners retain their First Amendment rights while incarcerated, "the complex and intractable problems of prison administration require due consideration in applying constitutional guarantees" in this context. *Ali v. Adamson*, 132 F.4th 924, 935 (6th Cir. 2025) (internal quotation marks omitted). To balance these interests, the Sixth Circuit has held that "[o]nly when a policy singles out and substantially burdens a prisoner's sincere beliefs do we ask if it serves a legitimate penological interest." *Id.* at 936.

"To state a claim for violation of a prisoner's First Amendment right to free exercise of his religion, he must allege facts showing that 'the belief or practice asserted is religious in the person's own scheme of things' and 'is sincerely held,' and that 'the challenged practice of the prison officials infringes on the religious belief.'" *Pryor v. Chambers-Smith*, No. 24-3301, 2025 WL 1090997, at *2 (6th Cir. Apr. 2, 2025) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th

(observing that "[i]f the court concludes that no constitutional violation occurred," qualified immunity applies).

Cir. 1987)). The prisoner must establish that his religious rights have been "substantially burdened," which requires proof that prison officials "place[d] 'substantial pressure on an adherent to modify his behavior and to violate his beliefs' or 'effectively bar[red]' his sincere faith-based conduct." *Id.* (quoting *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014)).

Defendants do not challenge that Carpenter's conduct was religious in his own scheme of things or that his beliefs are sincerely held. *See* [R. 44-1, pp. 12–13]. Rather, Defendants argue that Carmack's alleged misconduct did not substantially burden Carpenter's freedom to exercise his religious beliefs. *See id.*

As for Carpenter's first two allegations—that Carmack violated Carpenter's right to religious freedom by strip-searching him and by initiating a disciplinary action against him for a religious handshake—Carmack's affidavit states that he strip-searched and initiated a disciplinary proceeding against Carpenter based on KDOC policy. *See* [R. 44-2]. The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). "Courts generally accord great deference to prison officials' adoption and execution of policies, regulations, and practices relating to the preservation of internal order, discipline, and security within the prison environment." *Still v. Wilkinson*, 7 F. App'x 356, 358 (6th Cir. 2001) (order). Even assuming Carpenter's allegations amount to impingement of his rights, there is no issue of material fact that Carmack had a legitimate penological interest in strip searching and charging Carpenter.

LAC, through KDOC policy, prohibits affiliation with an STG and all STG related activity. *See* [R. 44-3, pp. 108-10]. Carmack's affidavit states that he strip-searched Carpenter in connection with a gang investigation. [R. 44-2, p. 2]. He also charged Carpenter for a gang-related handshake.

[R. 44-3, p. 6]. Carmack further states he believed Carpenter to be a member of the "Blood gang" because Carpenter had been in multiple fights with other members of that gang, has multiple tattoos generally affiliated with the gang, and, based on his training, believed the handshake to be associated with that gang. [R. 44-2, pp. 3–4]. This is reasonably related to a legitimate penological interest. *Cf. Johnson v. Stewart*, No. 08–1521, 2010 WL 8738105, at *2 (6th Cir. May 5, 2010) (order) ("[T]he defendants put forth evidence that the Nation of Gods and Earths was designated as an STG because it holds racial supremacist views and has been linked to violence and gang-related activity in other prison systems. Accordingly, a ban on written material related to the group is reasonably related to the legitimate penological goal of preventing violence and maintaining security.") (internal citations omitted). Therefore, Carmack did not violate Carpenter's First Amendment rights by strip-searching him or charging him under the disciplinary policy. *See, e.g.*, *Smith v. Houghton*, No. 2:25-cv-153, 2025 WL 2318473, at *7 (W.D. Mich. Aug. 12, 2025) ("Where a strip search is reasonably related to legitimate penological interests and is conducted in a reasonable manner, there is no First Amendment violation.") (citing *Still*, 7 F. App'x at 357–58).

To be sure, Carpenter testified that Carmack told him to "stop having meetings in my chapel." [R. 47-1, pp. 46–47]. However, Carpenter fails to demonstrate that such comments infringed upon his religious rights. In his affidavit, Carmack states he never discouraged Carpenter from attending religious services or from otherwise observing his faith. [R. 44-2, p. 3]. Further, even taken in the light most favorable to Carpenter, Carmack's comment did not interfere with Carpenter's religious practices as he continued to attend religious services. [R. 47-1, p. 47]. And isolated incidents, *see Lopiccolo v. Mich. Dep't of Corr.*, No. 2:20-12178, 2020 WL 5291961, at *2 (E.D. Mich. Sep. 4, 2020) (citing *Colvin v. Caruso*, 605 F.3d 282, 293–94 (6th Cir. 2010)), as well as verbal harassment, *see Guile v. Goulet*, No. 1:24-cv-1252, 2025 WL 1144554, at *11 (W.D.

Mich. Apr. 18, 2025) (quoting *Annabel v. Mich. Dep't of Corr.*, No. 1:14-cv-756, 2014 WL 4187675, at * 15 (W.D. Mich. Aug. 21, 2014) (collecting Sixth Circuit cases))), do not violate the Free Exercise Clause.

In sum, Carpenter failed to establish that Carmack substantially burdened his freedom to exercise his religious beliefs and, therefore, Defendants are entitled to summary judgment on Carpenter's First Amendment claim.

**2. Fourteenth Amendment Claims**

Carpenter next raises § 1983 claims against Noble and Akers for their respective roles in the disciplinary actions taken against him, claiming they violated his due process rights under the Fourteenth Amendment. That amendment provides, in relevant part, that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. On these claims, it is evident that Carpenter seeks to have his good-time credits lost in disciplinary proceedings restored. *See* [R. 1, p. 10]. In the context of prison disciplinary actions, "[t]o satisfy due process, a finding of guilt that results in a loss of good-time credits must be 'supported by some evidence in the record.'" *Meeks v. Washington*, No. 21-2670, 2022 WL 18144109, at *3 (6th Cir. July 29, 2022) (order) (quoting *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985)). This inquiry is limited to "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* In other words, unless the record is "devoid of evidence" rendering the decision arbitrary, the decision will stand. *See id.*

In their Motion for Summary Judgment, Defendants argue that due process was satisfied. *See* [R. 44-1, p. 19]. The Court agrees, as each decision rendered by Noble and affirmed by Akers was supported by a sworn statement, and four of the five included video or photographic evidence that corroborated the statement. *See* [R. 44-3, pp. 6–35]. This is sufficient to satisfy the "some

evidence" requirement. *See, e.g.*, *Flanigan v. Wilson*, No. 6:10-cv-111-GFVT, 2011 WL 5024432, at *6 (E.D. Ky. Oct. 20, 2011) (holding that a correctional officer's "statement provided sufficient evidence to satisfy due process concerns").

Nonetheless, Carpenter alleges Noble initiated proceedings, investigated them, and issued decisions in violation of KDOC policy. [R. 47-1, p. 62]. However, Carpenter is mistaken. For instance, the gang handshake disciplinary action was initiated by Carmack, investigated by Investigating Officer Vernon Mayes, approved by Supervisor Matthew Stepp, and the decision was rendered by Noble. *See* [R. 44-3, pp. 6–8]; *see also* [R. 44-5]. The same is true of each of the other proceedings (i.e., an officer initiated the action, Mayes investigated, a separate supervisor approved it, and Noble issued a decision). *See* [R. 44-3, pp. 11–34]; *see also* [R. 44-5].

Additionally, Carpenter claims Akers dismissed all his disciplinary appeals as untimely even though they were timely filed. [R. 47-1, pp. 85–86]. Again, Carpenter's assertion is not borne out by the record. Carpenter filed two appeal forms. *See* [R. 44-3, pp. 10, 35]. Nevertheless, all five of his disciplinary reports included a "Warden's Review" section, wherein Akers's reasoning for the decisions was included. *See id.* at 9, 14, 18, 28, 34. To be sure, three of the disciplinary appeals were dismissed as untimely. *See id.* at 14, 28, 34. However, two forms—both of which relate to the appeal forms Carpenter filed—were denied because, in Akers's view "[t]he due process requirements appear[ed] to be in order [and] [t]he evidence [was] sufficient in order to establish a finding of guilt." *Id.* at 9, 18. And, as discussed above, there was "some evidence" to support Akers's decisions.

At bottom, there is no issue of material fact as to Carpenter's due process claims, and Defendants are thus entitled to summary judgment on these claims as well.

### 3. Eighth Amendment Claim

Carpenter's final federal claim is that Wilson violated his Eighth Amendment rights. The Eighth Amendment prohibits, among other actions, "cruel and unusual punishments." U.S. Const. amend. VIII. To prove excessive force under the Eighth Amendment, a prisoner must establish that a government official applied force that was "objectively harmful enough to establish a constitutional violation" and that the official acted "with a sufficiently culpable state of mind." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks omitted). Ultimately, the inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6 (internal quotation marks omitted).

Even assuming that Wilson could be held liable for the actions of the responding officers who pepper sprayed and tased Carpenter, said force was applied in good faith to control Carpenter's aggressive actions. Carpenter threatened Wilson and ignored multiple orders to place his hands behind his back and to get on the ground. *See* [R. 46]; *see also* [R. 44-3, pp. 15, 43]. Although he was pepper sprayed, Carpenter continued to walk toward Wilson, having threatened to physically harm him. *See* [R. 46]; *see also* [R. 44-3, pp. 15, 43]. The Sixth Circuit has held "the use of a chemical agent does not constitute malicious or sadistic punishment in violation of the Eighth Amendment if its use is reasonably necessary to subdue a noncompliant prisoner." *Brown v. Perez*, No. 16-2558, 2017 WL 3378994, at *2 (6th Cir. Apr. 17, 2017) (order) (citing *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002); *Davis v. Agosto*, 89 F. App'x 523, 526 (6th Cir. 2004)). Likewise, it is "well-established that the use of tasers on recalcitrant prisoners does not violate the Eighth Amendment." *White v. Palmer*, No. 1:22-cv-890, 2022 WL 16946448, at *5 (W.D. Mich. Nov. 15, 2022) (citing *Caldwell v. Moore*, 968 F.2d 595, 600–02 (6th Cir. 1992)).

Therefore, as Carpenter does not have a claim of excessive force against Wilson, Defendants are entitled to summary judgment on this claim as well.

**C. Carpenter's State Law Claims**

Because Defendants' Motion for Summary Judgment should be granted as to Carpenter's federal claims, the Court will not exercise its supplemental jurisdiction over his state law claims. "[A] district court must ordinarily exercise supplemental jurisdiction over all related state claims and should only decline to do so, in its discretion, for one or more of the reasons enumerated in [28 U.S.C.] § 1367(c)." *Williams v. Addison Cmty. Schs.*, 168 F.4th 791, 796 (6th Cir. 2026). That statute provides that a district court may decline to exercise supplemental jurisdiction in four instances, including, among others, if "the district court dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

"In determining whether to exercise supplemental jurisdiction, the district court should balance several factors, including judicial economy, convenience, fairness, and comity." *Williams*, 168 F.4th at 794–95 (citation omitted). Generally, however, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 867 (6th Cir. 2024) (internal quotation marks omitted). Here, "the principle of comity weighs decidedly in favor of allowing the state law claims to be adjudicated in a state court." *Napier*, 2009 WL 2255767, at *6; *see also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) ("[I]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.") (internal quotation marks omitted). Accordingly, the Court will decline to exercise supplemental jurisdiction over Carpenter's state law claims; therefore, Carpenter's state law claims will be dismissed without prejudice.

## IV. CONCLUSION

For the above-stated reasons, the Court will grant summary judgment to Defendants on Carpenter's federal claims and dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion for Summary Judgment, [**R. 44**], is **GRANTED IN PART and DENIED IN PART**.
    i. The motion is **GRANTED** as to each of Carpenter's federal claims.
    ii. The motion is **DENIED** to the extent it seeks summary judgment on the state law claims.
2. Carpenter's state law claims are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).
3. A separate judgment will be entered consistent with this Order.

This the 21st day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY